SHELDON HANDLE *C*O. *v.* WILLIAMS.

Opinion delivered March 13, 1916.

1. MASTER AND SERVANT—DEFECTIVE APPLIANCES—ASSUMED RISK.—Plaintiff, an employee in defendant's factory, undertook to lace a machine belt, using strips cut from a piece of leather that defendant provided for the purpose, but which broke, by reason of the fact that the piece used was the thin part of the leather and an injury resulted to the plaintiff. It appeared that defendant had provided another piece of leather for lacing heavy belts, but that plaintiff, instead of waiting until he could get the heavier, used the lighter piece. *Held*, the leather which plaintiff did use, not being defective in any way, that he assumed the risk, and that the defendant was not responsible for the resulting injury.

2. MASTER AND SERVANT—INJURY TO SERVANT—ASSUMED RISK—SAFE PLACE TO WORK.—Where the duty is delegated to a servant to make his own working place and appliances safe, or to determine the sufficiency of the appliances or material which he has to use, then he assumes the risk of any danger arising from the use of such working place, appliance or material.

Appeal from Hot Spring Circuit Court; *W. H. Evans*, Judge; reversed and dismissed.

*M. S. Cobb* and *Wilson & Armstrong*, for appellants.

1.    A verdict should have been directed for defendant. This is a clear case of assumed risk. Where the duty is delegated to the servant himself of making his own working place and appliances safe, or to determine the sufficiency of the appliances or material which he has to use, then he assumes the risk of any danger arising from the use of such working place, appliances or material. There was no negligence on the part of the master; the material furnished was good and the choice of using it was left entirely to the servant. 26 Cyc. 1182, 1186; 100 Ark. 462; 95 *Id.* 560; 81 *Id.* 343; 93 *Id.* 140; 100 *Id.*

156; 101 *Id.* 197, 283; 108 *Id.* 377. The judgment should be reversed and the cause dismissed. 4 Thompson on Negl., § 4616.

2. The lacing was bought from a reputable and reliable dealer; it had been used by plaintiff since the factory was opened and had been tested by constant use. 65 Fed. 482; 163 Mass. 364; 132 N. Y. 273; 127 Fed. 92; 72 S. W. 113; 53 Atl. 665.

*H. B. Means* and *J. C. Ross,* for appellee.

It is conceded that, under our decisions as cited by appellants that where an employee is charged with the duty of making his own working place safe and fails to do so, etc., and injury results, his action for damages will fail either on the ground of assumed risk or contributory negligence, or both. But we do not concede that appellee here had that duty or assumed it. His only duty was to use the material furnished him for the purpose with ordinary care. The injury was caused by the inherent defect in the material furnished and there was no assumption of risk. He was not an expert and had only a few months experience and used the only lacing he could get in an emergency. The rule of simple appliances does not apply here. There was no error in the court's instructions. The law of this case is well settled as to the master's duty and responsibility in such cases.

McCULLOCH, C. J. Sheldon Handle Company is the name of a partnership composed of Mason Sheldon, M. O. Sheldon and Z. L. Sheldon, who are operating a wooden handle factory at Malvern, Arkansas. The factory was constructed in the autumn of 1913, and was actually put into operation in January or February, 1914. The plaintiff, Claude Williams, began working for the defendants at the factory before the actual operation was begun. In other words, he was employed in November, 1913, to do general work about the plant, and when the operations began he was put to work at a lathe and continued to work there until he received the injury, on August 31, 1914, for which he seeks to recover compensation in this

case. While he was at work at his lathe early in the fore-
noon of that day, a belt came loose from above him and
fell down and struck his elbow and threw his hand into the
knives of the machine, and serious injury to the limb
resulted.

The cause of the giving way of the belt was that the
lacing broke. There was no defect in the belt itself, and
the plaintiff testified that he noticed when he went to
work that morning that the lacing seemed to be in good
condition. It was a seven inch belt, and, according to
the testimony of one of the witnesses, carried ten or fif-
teen horse-power. The mill had been shut down nine
days—from Saturday, August 22, to Monday, August
31, the day plaintiff was injured. It was a part of plain-
tiff's duty to see that the things about his machine, in-
cluding the belt, were in proper order. Two or three
days before the mill was shut down, plaintiff put new
lacing in the belt. It is not explained in the testimony,
so far as we have observed, whether the lacing broke or
came loose or merely was thought to be worn out; but,
at any rate, plaintiff undertook to lace it, as was his duty.
Lace leather was kept in the plant to use in lacing the
belt. A side of lace leather had been purchased by Mr.
Sheldon, the manager, when the mill began operation
and was kept in a certain cupboard or locker. At this
time the side of leather had been used down to a strip
about six inches wide and about three feet long, which
included the thin or flanky part of the side. When
the plaintiff got ready to lace the belt he went to
the locker and got the piece of leather, but after looking
at it decided that he would rather cut the lacing from a
new side of leather which Mr. Sheldon had recently pro-
cured, but which it does not appear had been put in use.
He talked with one of the men, Mr. Burch, who was also
a witness in the case, and decided that he would rather
cut strips from the new side of leather because he could
get longer strips, and also because he thought that the
thicker part of the hide would be better. He went off to
find Mr. Sheldon, but the latter was away from the plant

at that moment and the office was locked, so without seeking further, the plaintiff went back and got the old piece of lace leather, and, with the help of Burch and another employee named Hicks, proceeded to cut the strips and lace the belt. The testimony shows that he cut the strips the full width allowed by the holes in the belt and that the lacing was properly performed.

The plaintiff and the other witnesses testified that the leather appeared to be and was in good condition, except that it was the thin and flanky part of the hide which was not so strong as the thicker part of the hide. There is some conflict in the testimony as to what is the best part of a side of lace leather, and there seems to be a difference of opinion as to the relative strength of the different parts, but it is undisputed that all parts of the hide are used, according to the size of the belt to be laced —that the larger the belt the stronger the lacing required, which is obviously true. Many of the witnesses say that the thin side of the hide is strong enough for anything below a seven or eight inch belt, and other witnesses say it is strong enough for any size belt.

(1) One of the contentions of counsel for defendant is that the plaintiff assumed the risk of the danger from using that particular piece of leather for lacing the belt, and we are of the opinion that the contention is sound and that the plaintiff has not made out a case for the recovery of damages. This is not a case of furnishing defective, rotten or worn-out material. It is uncontradicted that the side of leather purchased by the defendants and placed there for use was of the best material obtainable, and the only contention with respect to its unfitness for use is that it had been used down to the thin or flanky part of the hide, which it was claimed was not strong enough to be used in lacing a belt of that size. Now, it was a part of the plaintiff's duty to lace the belt, and it necessarily followed that he was to determine whether the material placed there was fit for that particular use. It would be different if the material purchased had been defective in any other way so that the master

might have discovered its unfitness by reasonable inspection, but such is not the case here, for the material was as before stated, fit for use, and the only question was whether the unused part was fit for the particular use that plaintiff wanted to put it to. If he discovered that it had been used down to the place where it was unfit for use in lacing a belt of that size, then he could not use it without assuming the risk of the danger. It was obvious from his own testimony that he did fully appreciate the fact that it was not altogether suited for that purpose, but he decided to go ahead and use it without waiting for the return of the superintendent so that he could get the new side of leather. He did proceed to use it of his own volition, and the belt remained in that condition throughout the period of nine days during which the mill was idle.

(2) The case falls, we think, within the principle announced by decisions of this and other courts to the effect that where the duty is delegated to the servant himself of making his own working place and appliances safe, or to determine the sufficiency of the appliances or material which he has to use, then he assumes the risk of any danger arising from the use of such working place, appliances or material. *Southern Anthracite Coal Co. v. Bowen,* 93 Ark. 140; *Fordyce Lumber Co.* v. *Lynn,* 108 Ark. 377; 4 Thompson on Negligence, section 4003.

The case of *Eligh* v. *Goldie,* 143 Mich. 596, 107 N. W. 316, which is cited on the brief of counsel for defendant, is quite similar to the facts of the present case. There the employee, whose duty it was to repair a belt, went to the foreman to get lace leather which he preferred to use rather than rivets, but upon the suggestion of the foreman he went back and used the rivets and an injury resulted from the breaking of the belt. The court held that the servant assumed the risk, and in disposing of that branch of the case said: "There is nothing in his testimony that indicates a lack of knowledge with reference to the manner in which the belt was fastened, nor that any representations were made to him to lead him to

suppose that the belt would be fastened in any other way than it was. As to this feature of the case he must be deemed to have assumed the risk."

To sum up the situation presented in this case, it is seen that there was no negligence on the part of the master in failing to exercise care to discover defects nor in furnishing material that was wholly unfit for use; but, on the contrary, the material which finally proved unfit for this particular use was in fact good material for other uses about the plant, and the choice of using it for this particular work was left entirely to the plaintiff. We think, therefore, that it presents a clear case of assumption of risk and that plaintiff has no right to recover. That being true, it is unnecessary to notice other assignments of error, and, the case having been fully developed, no useful purpose would be served in remanding it for a new trial.

The judgment is therefore reversed and the cause dismissed.

HART, J., dissenting.